United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 29, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 21-31948** |
| **WASHINGTON PRIME GROUP** | § | |
| **INC.,** *et al.,* | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **WPG ROCKAWAY COMMONS** | § | |
| **LLC,** *et al.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 22-3317** |
| | § | |
| **ROCKAWAY TOWNSHIP TAX** | § | |
| **COLLECTOR,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

WPG Rockaway Commons LLC, Rockaway Town Court, LLC, and Rockaway Town Plaza, LLC (collectively "WPG") are reorganized debtors that own real property in Rockaway Township, New Jersey. WPG filed this adversary proceeding against Rockaway Township Tax Collector, Rockaway Township Tax Assessor, and the Township of Rockaway (collectively "Rockaway"), alleging that certain WPG properties have been unfairly assessed by Rockaway under New Jersey law. WPG seeks a determination of the market value of the properties to determine its tax liability under § 505 of the Bankruptcy Code.

This matter concerns a motion to exclude the testimony of Rockaway's expert witness, Louis Izenberg. Mr. Izenberg is proffered as an expert to provide counter-appraisal valuations of the subject

properties. WPG argues that material inconsistencies between Mr. Izenberg's restricted appraisal reports and draft reports prepared prior to this adversary proceeding and counter-appraisal reports prepared for this adversary proceeding demonstrate his lack of reliability as an expert witness under Federal Rule of Evidence 702. Rockaway argues that Mr. Izenberg's restricted appraisal reports and draft reports are privileged and cannot be used by WPG to attack Mr. Izenberg's credibility. Rockaway argues in the alternative that, if not privileged, the reports nevertheless do not demonstrate any lack of reliability.

The July 30, 2019 restricted appraisal report is privileged. Although the April 27, 2022 and August 31, 2023 restricted appraisal reports are also privileged, Rockaway voluntarily waived the privilege. The April 6, 2022 draft report is not privileged. WPG has failed to demonstrate Mr. Izenberg's lack of reliability as an expert witness. Mr. Izenberg's testimony is not excluded.

## BACKGROUND

Washington Prime Group Inc. ("WPG Inc.") and its subsidiaries are a retail real estate development and management company with a portfolio of shopping centers across the United States. Case No. 21-31948, ECF No. 26 at 1. On June 13, 2021, WPG Inc. and its subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. *See, e.g.*, Case No. 21-31948, ECF No. 1. WPG Inc.'s joint plan of reorganization was confirmed on September 3, 2021. Case No. 21-31948, ECF No. 1022.

WPG filed this adversary proceeding against Rockaway on November 9, 2022. ECF No. 1. WPG alleges that certain WPG properties in Rockaway Township, New Jersey have been unfairly assessed by Rockaway under New Jersey law. ECF No. 1 at 4. WPG seeks a determination of the market value of the subject properties to determine its tax liability pursuant to § 505 of the Bankruptcy Code. ECF No. 1 at 5–6. Rockaway answered the complaint on December 12,

2022.  ECF No. 12.  WPG amended its complaint on April 6, 2023, which Rockaway answered on April 13, 2023.  ECF Nos. 17, 18.

During discovery, Rockaway produced 804 documents in response to WPG's requests for production.  The production included the disclosure of multiple restricted appraisal reports and draft restricted appraisal reports created by Louis Izenberg, a real property appraiser, for Rockaway's internal use.[1]  The reports involve the subject properties.

WPG deposed Mr. Izenberg on June 19, 2024.  During the deposition, Mr. Izenberg was questioned regarding the April 27 and August 31 restricted appraisal reports.[2]  During questioning, Rockaway's counsel identified the August 31 report as subject to the attorney-client privilege but failed to object to WPG's counsel's questions regarding the reports.  ECF No. 107-3 at 44.

Mr. Izenberg has been proffered as Rockaway's expert witness to provide counter-appraisal valuation reports and testify at trial.  ECF No. 94-3 at 2–3.  On June 28, 2024, WPG filed a *Motion to Exclude Testimony*, which requests an order excluding Mr. Izenberg's testimony due to his alleged lack of reliability as an expert.  ECF No. 90.  The motion relies on the April 27 and August 31 restricted appraisal reports as its basis for excluding the testimony.  WPG argues that the inconsistencies between the restricted appraisal reports and counter-appraisal reports demonstrate Mr. Izenberg's lack of reliability as an expert witness.  ECF No. 90 at 12–16.

On July 19, 2024, Rockaway filed its *Response to Plaintiffs' Motion to Exclude Expert Testimony*.  ECF No. 96.  Rockaway alleges that WPG's motion should be denied because the restricted appraisal reports are protected by the attorney-client privilege and are not subject

---

[1] The subject restricted appraisal reports are dated July 30, 2019, April 27, 2022, and August 31, 2023.  ECF Nos. 90-1 at 4; 90-3 at 4; 104-1 at 3; 105-1 at 1.  The subject draft restricted appraisal report is dated April 6, 2022.  ECF Nos. 104-3 at 7; 105-1 at 1.

[2] WPG did not discover that Rockaway produced additional restricted appraisal reports and draft reports until after the deposition took place.  ECF No. 104 at 1–2.

to disclosure.  ECF No. 96 at 19.  Rockaway also alleges that, if the reports are not privileged, Mr. Izenberg is nevertheless a reliable expert under Federal Rule of Evidence 702.  ECF No. 96 at 19–25.  Rockaway did not file a privilege log for the reports.

On July 12, 2024, the parties filed their joint pretrial statement. ECF No. 94.  In conferring on trial exhibits to be included in the pretrial statement, Rockaway agreed to admit the April 27 and August 31 restricted appraisal reports as authentic but not relevant to property values.  ECF No. 107-1 at 2–3.  WPG's trial witness and exhibit list marks the reports as agreed exhibits to be offered as authentic but not relevant.  ECF No. 94-1 at 3.  The reports are also attached as exhibits to the joint pretrial statement.  ECF No. 94-1 at 211, 252.

On July 22, 2024, the Court held a pre-trial hearing and heard oral argument on WPG's motion to exclude.  Rockaway argued that the reports were privileged and inadvertently disclosed.  The Court ordered Rockaway to produce a full privilege log by July 26, 2024, and both parties to file supplemental briefing on privilege by August 9, 2024.

Rockaway filed a *Notice of Rockaway's Sworn Statements and Privilege Log* on July 26, 2024.  ECF No. 102-3.  The log marks the April 27 and August 31 reports as privileged pursuant to the work product doctrine, Fed. R. Evid. 408, attorney-client privilege, and Fed. R. Evid. 502.  ECF No. 102-3 at 2.  In support of Rockaway's claimed privilege, the notice includes the sworn statements of Kimberly Johnson, Rockaway's tax assessor, and Levi J. Kool, Rockaway's tax appeal counsel.  ECF Nos. 102-1, 102-2.  The statements explain that the reports were sent by Mr. Izenberg to Mr. Kool and Ms. Johnson for use in connection with WPG's tax appeals filed in New Jersey Tax Court and this adversary proceeding.  ECF Nos. 102-1 at 3–4; 102-2 at 3–4.  The statements also provide that the reports were intended solely for Rockaway's Litigation Control Group and no other parties have access to the reports.  ECF Nos. 102-1 at 3–5; 102-2 at 3–5.

On August 8, 2024, WPG filed a *Supplement to Motion to Exclude Expert Testimony*.  ECF No. 104.  WPG asserts that, in preparation for the supplemental briefing on privilege, it reviewed Rockaway's document production and discovered an additional July 30, 2019 restricted appraisal report, a July 12, 2018 draft report, and an April 6, 2022 draft report all authored by Mr. Izenberg.  ECF No. 104 at 2.  WPG requests that the Court consider these additional reports in ruling on its motion to exclude.  ECF No. 104 at 2.  WPG also claims that it has discovered over twenty additional potentially confidential documents produced by Rockaway.  ECF No. 107 at 11–12.

On August 9, 2024, Rockaway filed a *Notice of Rockaway's Supplemental Privilege Log*.  ECF No. 105.  The supplemental privilege log includes, in addition to the April 27 and August 31 reports, the July 30 report and April 6 draft report.  ECF No. 105-1 at 1.  With respect to the July 30 report, the log asserts privilege based on the work product doctrine, Fed. R. Evid. 408, attorney-client privilege, and Fed. R. Evid. 502.  ECF No. 105-1 at 1.  With respect to the April 6 draft report, the log asserts privilege based on the work product doctrine, Fed. R. Evid. 408, attorney-client privilege, Fed. R. Evid. 502, and Fed. R. Civ. P. 26(b)(4)(B)–(C).  ECF No. 105-1 at 1.  Rockaway represents that it also sent a claw-back letter to WPG demanding return and sequestration of the July 30 report and April 6 draft report.  ECF No. 106 at 5–6.

On August 9, 2024, the parties submitted supplemental briefing on the issue of whether the restricted appraisal reports and draft report are privileged, and if privileged, whether the privilege has been waived. ECF Nos. 106, 107.

## JURISDICTION

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). Venue is proper in this District pursuant to 28 U.S.C. § 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2). The dispute has been referred to the Bankruptcy Court under General Order 2012-6.

## DISCUSSION

The issues pending before the Court are (i) whether the restricted appraisal reports and draft restricted appraisal report are privileged; (ii) if the reports are privileged, whether the privilege has been waived voluntarily or inadvertently; and (iii) whether Mr. Izenberg should be excluded as an expert witness due to a lack of reliability under Federal Rule of Evidence 702.

## I.   THE RESTRICTED APPRAISAL REPORTS ARE PRIVILEGED. THE DRAFT REPORT IS NOT PRIVILEGED

Rockaway claims that the restricted appraisal reports and draft restricted appraisal report are precluded from disclosure because they are privileged under the work product doctrine, attorney-client privilege, and settlement communications privilege. The restricted appraisal reports are privileged under the work product doctrine. The draft report is not privileged.

The burden of proof is on the party asserting privilege to demonstrate that the privilege applies. *First Am. CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132-TJW, 2010 WL 4975566, at *3 (E.D. Tex. Dec. 2, 2010) (citing *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D. 125, 134 (E.D. Tex. 2003)).

### A.   Work Product Doctrine

Federal Rule of Civil Procedure 26 governs the disclosure and discovery relating to experts. Rule 26 applies in adversary proceedings through Federal Rule of Bankruptcy Procedure 7026. Rule 26 provides

different disclosure requirements depending on the role served by an expert. *See* Fed. R. Civ. P. 26(a)(2)(B)–(C). "While the Fifth Circuit has not directly addressed [the] issue, other circuits have held someone may be a witness not required to produce a report as to portions of his testimony and simultaneously deemed a retained or specially employed expert who is subject to Rule 26(a)(2)(B) as to other portions." *Cooper v. Meritor, Inc.*, No. 4:16-CV-52, 2018 WL 2223325, at *6 (N.D. Miss. May 15, 2018) (quoting *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 (E.D. La. 2013)). "Accordingly, a witness may be designated as a Rule 26(a)(2)(B) retained reporting expert on certain issues, and a Rule 26(a)(2)(C) non-reporting expert for other issues." *Id.* When an expert serves in both a non-testifying consulting role and a testifying role, "the broader discovery for testifying experts applies to everything except 'materials generated or considered uniquely in the expert's role as consultant.'" *Sara Lee Corp. v. Kraft Foods Inc.*, 273 F.R.D. 416, 419–20 (N.D. Ill. 2011) (quoting *In re Com. Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 538 (N.D. Ohio 2008)); *accord Yeda Rsch. & Dev. Co. v. Abbott GmbH & Co. KG*, 292 F.R.D. 97, 109–10 (D.D.C. 2013) (finding that the dual-hat expert rule remains valid following the 2010 amendments to Rule 26); *Deere & Co. v. FIMCO, Inc.*, No. 5:15-CV-105-TBR-LLK, 2016 WL 11269254, at *3 (W.D. Ky. Dec. 5, 2016), *adhered to on denial of reconsideration*, No. 515CV00105TBRLLK, 2016 WL 11268964 (W.D. Ky. Dec. 22, 2016). "In light of Rule 26(a)(2)(B)'s broad disclosure requirement, courts have concluded 'any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery.'" *Sara Lee Corp.*, 273 F.R.D. at 420 (quoting *B.C.F. Oil Refining, Inc. v. Consol. Edison Co. of N.Y., Inc.*, 171 F.R.D. 57, 62 (S.D.N.Y. 1997)).

Rule 26(b) contains exceptions to Rule 26(a)'s disclosure requirements. The rule differs depending on whether an expert is designated as a non-testifying consultant or a testifying expert. With respect to non-testifying consultants:

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.  But a party may do so only:
>
> (i) as provided in Rule 35(b); or
>
> (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(D).   Rule 35(b) addresses medical examinations.  *See* Fed. R. Civ. P. 35(b).

When serving as a testifying expert, Rule 26(b)(4)(C) protects communications between the expert and a party's attorney.  The rule provides:

> Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications:
>
> (i) relate to compensation for the expert's study or testimony;
>
> (ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or
>
> (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

Fed. R. Civ. P. 26(b)(4)(C).   Rule 26(b)(4)(C) essentially applies Rule 26(b)(3)'s work product doctrine to communications between a testifying

expert and a party's attorney. These materials need not be disclosed unless "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed R. Civ. P. 26(b)(3)(A)(ii).

### (1)   *The Restricted Appraisal Reports*

Mr. Izenberg's restricted appraisal reports were prepared in connection with his role as a consultant for Rockaway. ECF No. 102-1 at 4. Rockaway's sworn declarations explain that the reports were intended to be used to "provide guidance to the governing body for potential exposure, and guidance to the tax assessor and tax attorneys in formulating litigation strategy and settlement positions." ECF No. 102-1 at 4. Rockaway uses the reports in order to determine whether it "should pursue settlement and whether the tax assessment can be supported at trial in connection with the New Jersey tax appeals filed prior to this adversary proceeding, and after the filing of the underlying adversary proceeding." ECF No. 102-1 at 4. Because the restricted appraisal reports were prepared in Mr. Izenberg's consulting capacity, the rule governing disclosures for consulting experts would apply to the reports.

But Mr. Izenberg is also a testifying expert. Mr. Izenberg was retained to provide counter-appraisal reports for this adversary proceeding and to testify at trial regarding Rockaway's tax valuations of the subject WPG properties. ECF No. 94-3 at 2–3. His role as a testifying expert involves substantial overlap with his role as a consulting expert. Mr. Izenberg's restricted reports provide valuations of the same subject properties for some of the same tax years as those in his counter-appraisal reports. ECF Nos. 90-1 at 5; 90-2 at 4; 90-3 at 5; 90-4 at 4; ECF No. 104-1 at 3. WPG asserts that there are material inconsistencies between the valuations, demonstrating Mr. Izenberg's alleged lack of reliability as an expert. ECF No. 90 at 12–16. The substantial overlap between the reports justifies applying the rules for testifying experts with respect to the restricted appraisal reports.

The restricted appraisal reports are communications between Mr. Izenberg and Rockaway's counsel subject to the work product doctrine. No Rule 26(b)(4)(C) exception applies. The reports may be disclosed only if WPG "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed R. Civ. P. 26(b)(3)(A)(ii). The standard requires a showing of both substantial need and undue hardship. *See In re Hardwood P-G, Inc.*, 403 B.R. 445, 464 (Bankr. W.D. Tex. 2009). "To show either substantial need or undue hardship, a party seeking discovery of ordinary work product must make a detailed showing of either need or hardship; a broad, unsubstantiated assertion is not sufficient." *Id.* (citing *Koenig v. Int'l Sys. & Controls Corp., Secs. Litig. (In re Int'l Sys. & Controls Corp. Secs. Litig.)*, 693 F.2d 1235, 1240 (5th Cir. 1982)).

"Undue hardship can be demonstrated if witnesses cannot remember key facts or are unavailable for depositions or if there is unusual expense incurred of interviewing or discovering the sought-after person or information, as the case may be." *Id.* "Substantial need may be shown where the information is only discoverable with the documents at issue themselves." *Id.*

WPG makes no arguments demonstrating substantial need and undue hardship, nor can it. WPG has already deposed Mr. Izenberg, and it claims that the deposition has been continued due to time restraints and has not been resumed. ECF No. 107 at 7. Unless the privilege has been waived, WPG may challenge Mr. Izenberg's valuations through further deposition, during cross-examination at trial, and through its own expert.

The July 30, 2019, April 27, 2022, and August 31, 2023 restricted appraisal reports are privileged under Rule 26. The Court need not address whether the reports are protected by the attorney-client privilege. Whether the privilege has been waived is addressed below.

### (2)    *The Draft Report*

Rockaway also claims that Mr. Izenberg's April 6, 2022 draft report is privileged under the work product doctrine. By Rockaway's own admission, the draft was not communicated to any Rockaway counsel. ECF No. 105-1 at 1. The report cannot be privileged under Rule 26(b)(4)(C).[3] Rather, Rockaway argues that "the draft report was used to create the April 27, 2022 Restricted Report," and it "is well-established law that draft reports created in anticipation of litigation are privileged." ECF No. 106 at 10.

Rockaway cites to *Windmeyer v. State Farm Fire & Cas. Co.* in supports of its proposition. No. CIV.A. 13-6557, 2014 WL 4104448 (E.D. La. Aug. 19, 2014). In *Windmeyer*, the court held that a draft report prepared by a party's expert was protected from disclosure under Rule 26(b)(4)(B). *Id.* at *4. There, the plaintiffs sued their insurance carrier for unpaid property damage and loss of business income caused by Hurricane Isaac's damage to their office building. *Id.* at *1. About a month prior to the suit, the plaintiffs' expert prepared a consulting report as to the cause of their losses and necessary repairs. *Id.* at *1–2. The plaintiffs conceded that if their expert was designated as a testifying expert, his final report would be disclosed, but that the prepared report was a non-discoverable draft report. *Id.* at *2. The court agreed. *Id.* at *4.

*Windmeyer* is distinguishable from this case. Rule 26(b)(4)(B) only protects "drafts of any report or disclosure required under Rule 26(a)(2)." Fed. R. Civ. P. 26(b)(4)(B). Rule 26(a)(2)(B) applies to reports of testifying experts. *See id.* It provides the requirements for an expert report provided to accompany the expert's testimony at trial. *See id.* Rule 26(a)(2)(B) requires the production of Mr. Izenberg's reports providing counter-appraisal valuations in this adversary proceeding. Rule 26(b)(4)(B) protects drafts of the counter-appraisal reports. But,

---

[3] For this same reason, the draft report does not qualify for the attorney-client privilege. *See Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017).

Rule 26(b)(4)(B) does not apply to the April 6 draft report, which was used to create the April 27 restricted appraisal report. The April 27 report was created for internal consulting and advice to determine the merits of Rockaway's position at trial and help determine trial and settlement strategy. ECF No. 102-1 at 4. Because the April 27 report does not fall under Rule 26(a)(2)(B), a draft of the report is not protected from disclosure under Rule 26(b)(4)(B).

Rule 26(b)(4) governs the work product protection of trial experts. Because Mr. Izenberg is a testifying expert, his April 6 draft report cannot be protected from disclosure by Rule 26(b)(4)(D), which governs work product protection for experts employed only for trial preparation. The only remaining subsection that may protect Mr. Izenberg's draft report is Rule 26(b)(4)(C). But Rule 26(b)(4)(C) only protects communications between a party's attorney and a testifying expert. Because the April 6 draft report was never sent by Mr. Izenberg to Rockaway's counsel, it does not qualify as a communication under Rule 26(b)(4)(C). ECF No. 105-1 at 1. The report is not protected by any Rule 26(b)(4) subsection.

The April 6 draft report is not privileged under Rule 26.

## B.  Settlement Communications Privilege

Rockaway's privilege log asserts Fed. R. Evid. 408 as a ground for excluding the April 6 draft report as privileged. ECF No. 105-1 at 1. Rockaway has not set forth any arguments as to the applicability of Rule 408 in its brief on privilege. Regardless, Rule 408 is inapplicable.

"By its terms, Rule 408 protects only 'conduct or statements made in compromise negotiations' regarding 'a claim that was disputed as to validity or amount.'" *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 295 (5th Cir. 2010) (quoting Fed. R. Evid. 408). "This protection extends to the legal conclusions, factual statements, internal memoranda, and the work of non-lawyers and lawyers alike so long as the communications were 'intended to be part of . . . negotiations toward

compromise.'" *Id.* (quoting *Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106 (5th Cir. 1981)).

There is no evidence to suggest the April 6 draft report was conveyed to WPG in an attempt to settle a dispute. Rule 408 does not apply to the report. The April 6 draft report is not privileged.

## II. THE PRIVILEGE IS WAIVED WITH RESPECT TO THE APRIL 27 AND AUGUST 31 RESTRICTED APPRAISAL REPORTS. THE PRIVILEGE IS NOT WAIVED WITH RESPECT TO THE JULY 30 RESTRICTED APPRAISAL REPORT

Although the restricted appraisal reports are privileged, the reports were sent to WPG's counsel during discovery. WPG argues that Rockaway's conduct following the disclosure requires a finding that Rockaway voluntarily waived the privilege with respect to the reports. ECF No. 107 at 26–29. Alternatively, WPG argues that, if the disclosure of the reports was inadvertent, the disclosure does not fall under the Fifth Circuit's standard for a non-waiving inadvertent disclosure. ECF No. 107 at 29–34. Rockaway argues that, although the restricted appraisal reports were disclosed during discovery, privilege was not waived voluntarily, and the disclosure was inadvertent. ECF No. 106 at 11–23.

"[T]he burden of proving waiver of work product immunity falls on the party asserting waiver." *S.E.C. v. Brady*, 238 F.R.D. 429, 444 (N.D. Tex. 2006).

### A. Voluntary Waiver

The work product privilege may be waived affirmatively. *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989). "[T]he mere voluntary disclosure to a third person is insufficient in itself to waive the work product privilege." *Id.* However, "the work product privilege is waived when the attorney requests the witness to disclose the information or when the attorney discloses the information to the court voluntarily or makes no objection when it is offered." *Id.* Waiver of the

work product privilege can also occur "when a party fails to state a privilege objection in the 'privilege log' as required under Federal Rule of Civil Procedure 26(b)(5)." *Nance v. Thompson Med. Co.*, 173 F.R.D. 178, 182 (E.D. Tex. 1997).

WPG argues that privilege has been voluntarily waived through (i) Rockaway's agreement to admit the April 27 and August 31 restricted appraisal reports at trial as authentic but not relevant; (ii) Rockaway's failure to object to questioning regarding the reports during the deposition of Mr. Izenberg; and (iii) Rockaway's failure to submit a privilege log for the reports.  ECF No. 107 at 26–29.

Rockaway does not dispute that, in correspondence with WPG's counsel, it agreed to admit the April 27 and August 31 reports as exhibits at trial; albeit for authenticity but not relevance.  ECF No. 107-1 at 2–3.  Per the parties' agreement, the reports are included in the parties' joint pretrial statement as agreed exhibits to be admitted at trial for authenticity.  ECF No. 94-1 at 3, 211, 251.  The inclusion of the reports as exhibits in the parties' joint pretrial statement is sufficient for a finding that Rockaway's counsel voluntarily disclosed the reports to the Court.  *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000) (internal quotation marks and citations omitted) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.").

The result is the same regardless of the fact that the reports are admitted at trial only for authenticity.  Even if the reports cannot be used to establish value, the information was nevertheless disclosed.  The test is of disclosure, not the purpose for which the information is offered.  *See Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir. 1993) (voluntary disclosure of information inconsistent with its confidential nature waives privilege).

Importantly, Rockaway was aware of the privileged nature of the April 27 and August 31 reports but took no remedial action to preserve

its privilege. The latest date that Rockaway could have learned the reports were disclosed to WPG was during Mr. Izenberg's deposition, where it noted the privileged nature of the August 31 report. ECF No. 107-3 at 44. Yet, Rockaway did not file a privilege log as required under Federal Rule of Civil Procedure 26(b)(5) until ordered by the Court over a month after the deposition. *See Nance*, 173 F.R.D. at 182; *Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017) ("Continual failure to adhere to Rule 26's prescription may result in waiver of the privilege where the court finds that the failure results from unjustified delay, inexcusable conduct, or bad faith."). Neither did Rockaway send WPG a claw-back letter, seek a protective order by the Court, or seek to amend the joint pretrial statement to remove the privileged reports as agreed exhibits. *Zapmedia Servs., Inc. v. Apple Inc.*, No. 2:08-CV-104-DF-CE, 2010 WL 5140672, at *2 (E.D. Tex. Sept. 24, 2010) (finding waiver of privilege due to delay in seeking claw back of privileged documents); *Adaptix, Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:12-CV-22, 2015 WL 12815316, at *3 (E.D. Tex. July 23, 2015) (same); *In re Grand Jury (Impounded)*, 138 F.3d 978, 982 (3d Cir. 1998) (finding waiver of privilege due to delay in seeking court protection over involuntarily disclosed privileged documents). Rockaway's lack of any protective action is inconsistent with its assertion of privilege.

Rockaway's voluntary disclosure of the April 27 and August 31 reports, and its inactions in seeking any protection, are sufficient to find that it voluntarily waived the privilege with respect to the reports. The July 30 report is not an agreed exhibit in the joint pretrial statement, and privilege cannot be waived with respect to the report on this basis.[4]

---

[4] The July 30 report was discovered by WPG upon re-review of Rockaway's document production in preparation for its supplemental briefing on privilege. ECF No. 104 at 2. The parties apparently were not aware that the report had been disclosed at the time of Mr. Izenberg's deposition or when conferring on their joint pretrial statement. Rockaway became aware that the July 30 report had been disclosed to WPG when WPG filed its supplement to its motion to exclude. ECF No. 106 at 13. The following day, after realizing the disclosure, Rockaway supplemented its privilege log to include the report and represents that it sent a claw-back letter to WPG. ECF Nos. 105-1 at

## B.    Subject Matter Waiver

Although the privilege with respect to the July 30 report was not waived voluntarily, privilege may be waived through subject matter waiver.  Federal Rule of Evidence 502(a) applies subject matter waiver to voluntarily disclosed privileged documents under certain circumstances.  Under Rule 502(a),

> When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

The first two elements are indisputably met.  With respect to the first element, "[w]hile Rule 502(a) 'does not require a showing of subjective intent to waive privilege;' it does require 'that the disclosing party knew or should have known [the communication was] privileged.'" *RLIS, Inc. v. Cerner Corp.*, No. 3:12-CV-209, 2014 WL 12599509, at *1 (S.D. Tex. Dec. 24, 2014) (quoting Christopher Mueller & Laird Kirkpatrick, Federal Evidence § 5:35 (4th ed. 2013)).  Rockaway knew the April 27 and August 31 reports were privileged at the time of the parties' joint pretrial statement because, about one month prior, it identified the August 31 report as privileged during Mr. Izenberg's deposition.  ECF No. 107-3 at 44.

---

1; 106 at 5–6.  Accordingly, voluntary disclosure is not a basis to find waiver with respect to the July 30 report.

With respect to the second element, the July 30 and April 27 reports both express valuation opinions regarding the subject WPG property located at 367 Mount Hope Avenue.  ECF Nos. 90-3 at 2; 104-1 at 2.  This fact satisfies the second element.

With respect to the final element, "Rule 502(a) is limited 'to situations in which a party intentionally puts protected information into the litigation in a selective, misleading *and* unfair manner.'" *RLIS, Inc.*, 2014 WL 12599509, at *1 (quoting Fed. R. Evid. 502(a) advisory committee's note).  Fairness does not justify applying subject matter waiver to the July 30 report.  This is not a situation where Rockaway selectively chose to disclose the April 27 and August 31 reports, but not the July 30 report, in an attempt to gain a tactical advantage over WPG. The facts indicate that Rockaway was initially unaware that the April 27, August 31, and July 30 reports were disclosed to WPG, but for whatever reason it voluntarily agreed to admit the April 27 and August 31 reports at trial.  Rockaway's agreement to admit the reports provide it with no apparent tactical advantage, as WPG now attempts to use the reports against Rockaway to exclude Mr. Izenberg's testimony.  *See RLIS, Inc.*, 2014 WL 12599509, at *1 ("The unredacted portions of the email do not seem to help Cerner.  To the contrary, the Court relied on the unredacted parts of the email in denying Cerner's motion for summary judgment on willfulness.").  The final element precludes applying subject matter waiver to the July 30 report.

The privilege with respect to the July 30 report is not waived through subject matter waiver.

## C.   Inadvertent Disclosure

WPG claims that, even if the privilege with respect to the July 30 report is not waived voluntarily, privilege is nevertheless waived because the disclosure of the report does not satisfy the Fifth Circuit's inadvertent disclosure standard.  ECF No. 107 at 29–34.

Waiver through inadvertent disclosure in federal proceedings is governed by Federal Rule of Evidence 502(b), which provides:

> When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:
>
> (1) the disclosure is inadvertent;
>
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
>
> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b). "Rule 502(b) retains—without codifying—the multifactor test set out in the case law, which is 'a set of non-determinative guidelines that vary from case to case.'" *Alpert v. Riley*, 267 F.R.D. 202, 209 (S.D. Tex. 2010) (quoting Fed. R. Evid. 502(b) advisory committee's note).

In determining whether the inadvertent disclosure of documents waives privilege, the Fifth Circuit follows the five-factor test set out in *Alldread*: "(1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." 988 F.2d at 1433. "This waiver analysis is identical for attorney-client privilege and work-product protection." *Alpert*, 267 F.R.D. at 209–10.

Prior to applying the *Alldread* factors, the Court must find that Rockaway's disclosure of the July 30 report was inadvertent. *See id.* at 210. The standard for determining an inadvertent disclosure is "whether the party intended a privileged or work-product protected document to be produced or whether the production was a mistake." *T&W Holding Co., LLC v. City of Kemah, Texas*, 641 F. Supp. 3d 378, 382 (S.D. Tex. 2022) (quoting *Coburn Grp., LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1038 (N.D. Ill. 2009)).

Rockaway's disclosure of the July 30 report was inadvertent. Rockaway produced 804 documents in response to WPG's requests for production, and the parties do not dispute that Rockaway was unaware that it produced any of the subject restricted appraisal reports. Rockaway provided sworn statements indicating that the restricted appraisal reports are intended for internal use and are only shared between Rockaway's Litigation Control Group, which includes its "tax assessor, business administrator, the expert appraiser, and the attorneys assigned to the appeal."  ECF No. 102-1 at 5.  The sworn statements also provide that the reports are intended to remain strictly confidential and cannot be shared with third parties unless authorized, and Rockaway did not give authorization to the Litigation Control Group to share the reports with any third parties.  ECF No. 102-1 at 5. These facts support a finding that Rockaway did not intend to disclose the reports to WPG during discovery.

The first *Alldread* factor considers the reasonableness of precautions taken to prevent disclosure.  *Compare Ferko*, 218 F.R.D. at 140 (finding reasonable precautions when attorneys reviewed documents prior to production, organized documents into separate categories, and marked the documents at issue as "Highly Confidential"), *and Stuntz v. Ashland Elastomers, LLC*, No. 1:14-CV-00173-MAC, 2018 WL 11451292, at *6 (E.D. Tex. Oct. 23, 2018) (finding reasonable precautions when attorneys reviewed the documents prior to production), *with Myers v. City of Highland Vill., Texas*, 212 F.R.D. 324, 327 (E.D. Tex. 2003) (finding no reasonable precautions when attorneys did not review the documents prior to production and otherwise failed to show any precautions taken).

Rockaway's sworn statements outline the steps taken to preserve the reports in the ordinary course of business.  As explained above, the reports are maintained internally within the Litigation Control Group and cannot be shared with parties outside of the Litigation Control Group unless specifically authorized, and Rockaway did not give authorization to share the reports with third parties.  ECF No. 102-1 at

4–5.  The July 30 and April 27 reports are both marked "privileged and confidential."  ECF Nos. 90-3 at 2; 104-1 at 2.  Rockaway represents that the August 31 report, although not marked as confidential, "was hidden in a subfolder of a subfolder and not readily accessible."  ECF No. 106 at 13.  Rockaway also represents that its counsel reviewed the records prior to production.  ECF No. 106 at 13.  These facts align with cases where courts found precautions reasonable.  Although the reports were inadvertently disclosed, sufficient protocol was in place to prevent the disclosure.  The first factor favors preservation of the privilege.

The second *Alldread* factor considers the amount of time taken to remedy the error.  "The duty to *promptly* take reasonable steps arises when the opposing party . . . can prove actual knowledge of the disclosure."  *Stuntz*, 2018 WL 11451292, at *6 (finding that prompt action was taken when the defendant contacted the plaintiffs the day after gaining actual knowledge of the disclosure and requested return of the documents).

Rockaway discovered its disclosure of the July 30 report when WPG filed its supplement to its motion to exclude, which provides the July 30 report as an additional exhibit for the Court's consideration of the motion.  ECF Nos. 104; 106 at 13.  The day after WPG filed the supplement, Rockaway supplemented its privilege log to include the July 30 report and represents that it sent a claw-back letter to WPG demanding return and sequestration of the report.  ECF Nos. 105-1 at 1; 106 at 5–6.  The second factor favors preservation of the privilege.

The third *Alldread* factors considers the scope of discovery.  Courts generally find that a voluminous number of produced documents favors maintaining privilege, reasoning that a large production increases the probability of an inadvertent disclosure.  *See Myers*, 212 F.R.D. at 327 (finding a production of approximately 1,500 pages of documents favored maintaining privilege); *Ferko*, 218 F.R.D. at 141 (finding a production of over 78,000 pages of documents favored privilege).

Rockaway produced approximately 9,640 pages of documents. The extent of this production aligns with cases finding the third factor favoring preservation of the privilege.

The fourth *Alldread* factor considers the extent of disclosure. Courts generally compare the total amount of documents produced with the amount of inadvertently produced privileged documents. *See Myers*, 212 F.R.D. at 327–28; *Ferko*, 218 F.R.D. at 141; *United States v. Citgo Petroleum Corp.*, No. CR. C-06-563, 2007 WL 1125792, at *5 (S.D. Tex. Apr. 16, 2007); *ERA Franchise Sys., Inc. v. TMG Real Est. Servs., L.L.C.*, No. CV H-06-2765, 2007 WL 9747270, at *2 (S.D. Tex. Mar. 30, 2007). A small ratio of inadvertently produced documents to the total documents produced favors maintaining the privilege. *Compare Myers*, 212 F.R.D. at 327–28 (finding one, four-page, privileged document disclosed out of 1,500 pages favored maintaining privilege), *and Ferko*, 218 F.R.D. at 141 (finding two privileged documents disclosed out of approximately 63,000 pages favored maintaining privilege), *and Corona v. Chevron Corp.*, No. CV H-07-3190, 2008 WL 11483069, at *4 (S.D. Tex. June 18, 2008) (finding two privileged pages disclosed out of 502 pages favored maintaining privilege), *and ERA Franchise Sys., Inc.*, 2007 WL 9747270, at *2 (finding one privileged document disclosed out of 700 pages favored maintaining privilege), *with Alpert*, 267 F.R.D. at 212 (finding 400 documents disclosed out of "tens of thousands of files" favored waiver), *and Citgo Petroleum Corp.*, 2007 WL 1125792, at *5 (finding extent of disclosure significant where "of 27 file drawers of documents . . . only one and a half file drawers contained documents labeled 'privileged[]'").

WPG asks the Court to consider the total number of "potentially confidential documents" in determining whether the extent of disclosure favors waiver. ECF No. 107 at 33. According to WPG, 2,549 pages (26%) of the total 9,640 pages of produced documents are potentially confidential. ECF No. 107 at 33. WPG's proposed analysis requires too much conjecture. The Court only considers the disclosed documents to which Rockaway has actually asserted privilege.

Although Rockaway voluntarily waived privilege with respect to two of four documents in its privilege log, three of those four documents, the restricted appraisal reports, are privileged absent the waiver. Per the Court's calculations, the restricted appraisal reports consist of 119 pages. However, WPG asserts that the reports total 561 pages. ECF No. 107 at 33. It appears the Court has an incomplete record of the entirety of these reports. But even accepting the Court's page count as true, 119 privileged pages out of 9,640 pages, or roughly 1.2% of the total production, exceeds the acceptable ratio for maintaining privilege. The fourth factor favors waiver.

With respect to the final *Alldread* factor, the overriding issue of fairness, a "party to whom privileged documents are produced inadvertently . . . has no inherent 'fairness' interest in keeping them, unless the producing party waited so long to address the problem after having been informed of it that the receiving party reasonably changed its position in reliance upon their continued availability." *Hawkins v. Wadley Reg'l Med. Ctr.*, No. 5:05CV154, 2006 WL 8440539, at *6 (E.D. Tex. Sept. 20, 2006) (quoting *Bagley v. TRW, Inc.*, 204 F.R.D. 170, 182 (W.D. Cal. 2001)); *see also Corona*, 2008 WL 11483069, at *5 ("[A] party to whom privileged documents are produced inadvertently has no inherent 'fairness' interest in keeping them." (quoting *Myers*, 212 F.R.D. at 328)).

Because Rockaway voluntarily waived privilege with respect to the April 27 and August 31 reports, the Court considers the inherent fairness for WPG to keep the July 30 report. As discussed, Rockaway did not delay asserting its privilege over the July 30 report. WPG's only proffered use for the July 30 report is to exclude Mr. Izenberg's testimony by attempting to demonstrate that the report is inconsistent with his counter-appraisal reports offered in this adversary proceeding. ECF No. 104 at 2. WPG's use for the report does not justify waiving privilege under these circumstances. WPG may attack Mr. Izenberg's credibility through the April 27 and August 31 reports and at trial. The final factor favors preservation of the privilege.

In sum, four of five *Alldread* factors favor preserving privilege over the July 30 report. The privilege is maintained with respect to the report.

### III.   MR. IZENBERG'S TESTIMONY IS NOT EXCLUDED

The Court next considers WPG's motion to exclude Mr. Izenberg's testimony. WPG argues that the inconsistencies between Mr. Izenberg's valuations in the April 27 and August 31 restricted appraisal reports and the November 22, 2023 and November 28, 2023 counter-appraisal reports highlight Mr. Izenberg's unreliability as an expert witness. ECF No. 90 at 12. According to WPG, the USPAP appraisal guidelines require a property appraisal to be developed with the same level of rigor regardless of whether an appraisal report is restricted or non-restricted. ECF No. 90 at 15–16. WPG argues, "despite having the same data available, and in many instances relying on the same surveys and information, [the reports] come to different valuations for some of the tax years in dispute for these properties." ECF No. 90 at 6. WPG claims that Mr. Izenberg admitted at his deposition that the restricted appraisal reports and counter-appraisals provide inconsistent valuations for the subject WPG properties regarding some of the same tax years, and that the inconsistencies can be attributed to Mr. Izenberg taking "less care" with the restricted appraisal reports. ECF No. 90 at 10–11. The sum of WPG's arguments is that Mr. Izenberg's lack of rigor in preparing the restricted appraisal reports in contravention with USPAP guidelines has resulted in materially inconsistent valuations of the same properties as of the same dates, demonstrating Mr. Izenberg's unreliability as an expert witness.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court interpreted Rule 702 in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "The Court explained that Rule 702 assigns to a district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 597).

This role requires the district judge to undertake a two-part analysis. The district judge must first determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid. Second, the district judge must determine whether that reasoning or methodology can be properly applied to the facts in issue; that is, whether it is relevant.

*Id.* (citing *Daubert*, 509 U.S. at 592–92). WPG only contests the reliability of Mr. Izenberg's testimony.

To be reliable, an expert's testimony "must be grounded in methods and procedures of science and must be more than unsupported speculation or subjective belief." *Id.* (citing *Daubert*, 509 U.S. at 590). "[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based

on the scientific method, and therefore, are reliable." *Id.* (quoting *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)).

Courts consider four factors in determining whether an expert's testimony is reliable:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Id.* at 668–69 (quoting *Daubert*, 509 U.S. at 593–94). "An expert witness's testimony should be excluded if the district court 'finds that the witness is not qualified to testify in a particular field or on a given subject.'" *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)). But once a witness is qualified to testify, "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

WPG does not contend that Mr. Izenberg's application of the USPAP guidelines to perform restricted appraisals of the subject properties was error. Nor does WPG claim that the guidelines themselves are unreliable. Rather, WPG argues that Mr. Izenberg's reports do not comply with the guidelines, implicating subsection (d) of Rule 702. "[T]he district court has 'broad latitude' when deciding whether . . . testimony is reliable, and thus admissible, as well as when deciding how to test the testimony's reliability." *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999)).

Under the USPAP appraisal guidelines, although restricted appraisal reports may provide for a more limited reporting of appraisal results, the development of all appraisals must meet the same USPAP standards for credibility:

> [R]egardless of whether a *report* contains only the minimum contents, the SCOPE OF WORK RULE still requires an appraiser to "determine and perform the scope of work necessary to *develop* credible assignment results."

> Since the development process for an appraisal is separate from the reporting process, the choice of different reporting option does not affect the USPAP requirements for development. The appraiser must comply with STANDARDS 1, 7, or 9 to *develop* credible assignment results, regardless of the length or type of form or format used to *report* the appraisal.

ECF No. 90-8 at 3.

WPG identifies the following differences in valuations between the appraisal reports:

| | ROCKAWAY COMMONS | | |
|---|---|---|---|
| | 8/31/2023 | 11/28/2023 | Δ |
| Value as of October 1, 2015 | - | $ 39,545,000.00 | - |
| Value as of October 1, 2016 | - | $ 41,065,000.00 | - |
| Value as of October 1, 2017 | - | $ 41,065,000.00 | - |
| Value as of October 1, 2018 | - | $ 41,065,000.00 | - |
| Value as of October 1, 2019 | $ 40,710,000.00 | $ 38,995,000.00 | $ 1,715,000.00 |
| Value as of October 1, 2020 | $ 40,710,000.00 | $ 37,555,000.00 | $ 3,155,000.00 |
| Value as of October 1, 2021 | $ 39,585,000.00 | $ 37,555,000.00 | $ 2,030,000.00 |

| | ROCKAWAY TOWN PLAZA | | |
|---|---|---|---|
| | 4/27/2022 | 11/22/2023 | Δ |
| Value as of October 1, 2018 | - | $ 22,855,000.00 | - |
| Value as of October 1, 2019 | $ 19,090,000.00 | $ 22,855,000.00 | $ (3,765,000.00) |
| Value as of October 1, 2020 | $ 19,090,000.00 | $ 22,010,000.00 | $ (2,920,000.00) |
| Value as of October 1, 2021 | - | $ 22,010,000.00 | - |

ECF No. 90 at 5.  WPG also identifies the following inconsistencies in the appraisal metrics:

(a) the same junior anchor and inline market rents, despite relying on different comparables;

(b) different market rents while relying on completely different comparables in reports issued less than three months apart;

(c) different vacancy rates for the same time periods, despite relying on the same CoStar Group Program;

(d) different expenses for leasing commissions and administrative and general, yet the same expenses for tenant improvement and structural reserves, despite using the same "market-derived expenses for retail shopping centers" data;

(e) different survey data, despite being from the same source and quarter; and,

(f) different selected mortgage rates despite relying on the same data and surveys.

ECF No. 90 at 6.  WPG concludes that, because the restricted appraisal reports and counter-appraisal reports are inconsistent in their valuation methods and results with respect to the same properties as of the same time, the restricted appraisal reports do not meet USPAP guidelines for credibility.

WPG relies on *Turner Outdoor Advert., Ltd. v. Comm'r* in arguing that the inconsistencies between the reports render Mr. Izenberg unreliable.  69 T.C.M. (CCH) 2692 (T.C. 1995).  In *Turner*, the tax court found a property appraiser unreliable based on inconsistencies between two appraisal reports.  *Id.* at *6.  The court reasoned:

Hedenquist prepared two appraisal reports, one in 1991 and one in 1994, in preparation for the trial in this case. The appraisals were of the same property, as of the same time.   The 1994 report is the primary support for

> respondent's position.  Both of the reports appear to be based upon the same appraisal methodologies and assumptions used by petitioner's experts, but the total fair market value in the first report is half the amount in the second report.  Hedenquist, however, could not provide the Court with an adequate explanation as to why the values differed in the two reports.

*Id.* at \*6.  *Turner* is distinguishable from this case.  In *Turner*, the court could not conclude that the expert's appraisals were reliable because the two reports of the same properties as of the same time produced entirely different fair market values, despite being based on the same methodologies and assumptions.

Mr. Izenberg explained in his deposition testimony that, although there are inconsistencies between the restricted appraisals and counter-appraisals, the inconsistencies are attributed to the information and metrics available at the time Mr. Izenberg prepared the restricted appraisal reports.  Mr. Izenberg's deposition testimony provides:

> A simple reading of the document indicates there's one line listings of possible comparables.  There is no statistical data in support of the vacancy levels.  There is no analysis with respect to—there is no adjustment grids.  This was a very brief snapshot with the information I had at that time of the property.  And just the simple fact that one report is 36 pages and the other one is . . . 200 speaks for . . . itself.  This was just an internal advisory.
>
> . . .
>
> [T]he comparables were . . . still being developed.  The tax court comparables were not developed by the time the restrictive was completed.  That's number one, which again these comparables in my confidential document are a survey as opposed to specific comparable data with adjustment grids and analysis.  I didn't develop the

> empirical data in support of a capitalization rate. I did not
> provide a market study as to the occupancy levels of retail.
> . . .
>
> I can just go on and on about the things that are not
> contained in the advisory . . . . Just trying to give them an
> idea again as to an opinion, cursory opinion of value verses
> the contested assessment.

ECF No. 96-7 at 162, 171. Mr. Izenberg's deposition testimony indicates that the restricted appraisal reports were intended to provide an estimated assessment of value for internal advisory purposes based on information available at the time the reports were produced. USPAP Advisory Opinion 38 provides that both restricted appraisal reports and non-restricted appraisal reports may exclude the development of certain metrics so long as the reasons for the exclusion are stated. ECF No. 96-5 at 2–3. WPG has not identified any USPAP development standard violated by the restricted appraisal reports.

Mr. Izenberg explained that when he prepares an appraisal report for a property that has previously been appraised, data from the prior appraisal report will be used for the new appraisal only if still accurate based on passage of time, but that the report is generally based on new data. ECF No. 96-7 at 112. Mr. Izenberg explained that he only changes a prior appraisal report in rare circumstances where new information or a mistake comes to light before a report is finalized. ECF No. 96-7 at 114–16. This practice complies with USPAP guidelines. ECF No. 96-4 at 2.

It is logical that a new appraisal of a property produced with updated metrics would result in a different valuation. The valuation deltas between the restricted reports and counter-appraisal reports, while not insignificant, do not approach the 50% valuation difference in *Turner*. 69 T.C.M. (CCH) 2692, at *6. Moreover, the expert in *Turner* did not provide the court with a valid explanation for why the values

differed. *Id.* at *6.  Mr. Izenberg's explanation properly accounts for the valuation changes.

Mr. Izenberg also outlined the detailed process he undertakes when appraising a property:

(1) Once Mr. Izenberg is engaged to appraise a property, he first sends out a request for information relating to income and expenses, rent rolls, capital expenditures, property conditions, and assessments or reports.

(2) Once the information is received, Mr. Izenberg schedules an inspection of the property.

(3) Mr. Izenberg then begins gathering data for the appraisal, including by reviewing publicly available information to identify parking layouts and bordering properties and developing comparable data of similar asset types.

(4) Once the data is gathered, Mr. Izenberg begins the appraisal process.  Mr. Izenberg first completes factual sections including property identification, zoning, site description, improvement description, delineation of title, highest and best use analysis, and the identification of appraisal approaches.

(5) Mr. Izenberg then engages in the data analysis portion of the appraisal, which requires organizing the data in a suitable format and determining which information to use and whether the information is acceptable.

(6) After the data analysis is complete, Mr. Izenberg prepares a market study, where he focuses on rents, vacancy, absorption, and expenses in the relevant market.  He uses this information to develop a market rent.

(7) Mr. Izenberg then engages in an expense analysis, where he analyzes actual and comparable operating performance in order to opine on expected property expenses.

(8) Mr. Izenberg then performs a capitalization analysis, where he capitalizes the net income developed through the analysis by a market derived capitalization rate based on industry

statistics. Mr. Izenberg rebuilds the capitalization rate through a band of investment analysis focusing on leveraging, loan amounts, the cost of money, and mortgage rights. The data gathered through the capitalization analysis is used to generate the overall rate, which is divided into the net income.

(9) Mr. Izenberg lastly develops the data into a narrative report.

ECF No. 96-7 at 107–11.

Mr. Izenberg's deposition testimony demonstrates a consistent application of appraisal methods to available data. WPG has not presented any evidence to suggest the available data was incorrectly applied. WPG has failed to demonstrate that Mr. Izenberg lacks reliability as an expert witness. Moreover, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility . . . ." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987)).

Mr. Izenberg's testimony will not be excluded under Federal Rule of Evidence 702.

The Court notes that the discrepancies remain "fair game" at trial. WPG may or may not be able to seriously damage Mr. Izenberg's credibility. Those issues will go to the weight and not the admissibility of his testimony.

## CONCLUSION

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED 10/29/2024

Marvin Isgur
United States Bankruptcy Judge